UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| BRYAN STEWART, | ) |
| | ) |
| Plaintiff, | )   CASE NO. : _____ |
| | ) |
| v. | ) |
| | )   JURY TRIAL REQUESTED |
| GOLDEN VICTORY MEDICAL LLC, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Bryan Stewart ("Stewart" or "Plaintiff") files this complaint for relief and damages against Defendant Golden Victory Medical LLC ("Golden Victory" or "Defendant"). Plaintiff relies on the following allegations and causes of action.

## NATURE OF THE ACTION

1. This employment action arises under the retaliation provision of the False Claims Act, 31 U.S.C.A. § 3730(h)(1) ("False Claims Act" or "FCA"). Plaintiff took various steps to stop Defendant's repeated violations of the FCA, which included but were not limited to improper coding of medical procedures, assorted inappropriate billing practices, and flawed documentation of services. This array of fraudulent billing practices resulted in overpayments to Defendant by

1

federal payers. Defendant retaliated against Plaintiff by terminating him solely because of his efforts to stop one or more violations of the False Claims Act. Plaintiff seeks back pay, liquidated damages, special compensatory damages, and his attorneys' fees and costs of litigation.

2. Plaintiff further alleges a common law claim for breach of contract under Minnesota law, over which this Court may exercise supplemental jurisdiction pursuant to 28 U.S.C.A. § 1367.

## THE PARTIES

3. Plaintiff Stewart is a citizen of the United States who was remotely employed by Golden Victory during the events alleged in this complaint while he resided in Shelby County, Alabama.

4. Defendant Golden Victory is a for-profit integrated health care services company that receives federal fees for the performance of medical services and therefore is subject to liability under the False Claims Act, 31 U.S.C.A. § 3729 *et. seq.*

## SUBJECT MATTER JURISDICTION AND VENUE

5. Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. § 1331 and 31 U.S.C.A. §3732(a).

6. Venue is proper in this district under 37 U.S.C.A. § 3732(a), as Defendant's principal owners reside in this district. Plaintiff also executed an employment agreement setting jurisdiction in this district as to any action arising out of his termination. *See* Exhibit A.

## FACTUAL ALLEGATIONS

**Background information**

7. Golden Victory is a privately held Nevada-based limited liability company that operates five clinics in four states and specializes in behavioral health, including mental health medication management, neurofeedback therapy, psychiatric and psychological assessments, therapy, and counseling.

8. The co-owners of Golden Victory are Gabriel Luthor and Elizabeth Brown, who founded the company in late 2017 by acquiring a group of existing clinics.

9. In November 2021, Stewart was hired as the first Chief Executive Officer ("CEO") of Golden Victory, with a directive to provide a professional structure for the integration of Golden Victory's clinics and to create a high-quality corporate infrastructure. The company permitted Stewart to operate remotely from his personal residence in Alabama.

10. Stewart is a nationally recognized expert in the complex field of health services management. His portfolio within the past decade includes stints as founder and CEO of a Birmingham, Alabama-based medical device company; Chairman of the Board and CEO of a Florida business, PracticeWise, which focuses on youth mental health technology; and Principal Growth and Strategy Consultant for Sage Growth Partners, a Maryland-headquartered health care strategy consulting firm. Stewart is also a former captain in the United States Marine Corps.

11. The patients at Golden Victory's clinics are insured through a combination of private and public-sector sources, such as Medicare, which covers individuals over age 65, and Medicaid, which covers low-income children and individuals whose income is below 133% of the federal poverty level. Approximately 65% of the patients at Golden Victory are Medicare or Medicaid beneficiaries.

**Relevant billing regulations**

12. Government payer services are regulated by the Centers for Medicare & Medicaid Services ("CMS"), which provides detailed criteria for the reimbursement of providers for services covered by Medicare and Medicaid.

13.     Under Medicare and Medicaid, services provided by nonphysician providers ("NPPs") are paid at 85% of the Medicare Physician Fee Schedule ("MPFS"). Services that are provided by NPPs as part of a "split/shared physician visit" or rendered "incident to" physicians' services may be billed at 100% of the MPFS. Both split/shared physician visits and incident-to services are governed by physical presence and documentation requirements.

14.     A split/shared visit is defined by Medicare Part B as a "medically necessary encounter with a patient where the physician and a qualified NPP each personally perform a substantive portion of [a] visit face-to-face with the same patient on the same date of service. A substantive portion of [a] visit involves all or some portion of the history, exam or medical decision making key components of [a] service."[1]

15.     The incident-to rule permits NPPs to receive reimbursement at a 100% physician fee rate if the initial patient visit is performed by the supervising physician, who evaluates, diagnoses, and devises a treatment plan, and subsequent follow-up care is provided by the NPP in accordance with specific guidelines.

16.     The criteria for incident-to follow-up care require that (1) the physician must maintain direct supervision, in that while the supervising physician

---

[1] https://www.aapc.com/blog/23741-Medicare's-splitshared-visit.

need not be present in the same room as the NPP while services are rendered, the physician must be in the same physical office suite as the NPP and must be immediately available to furnish assistance during the entire course of treatment; (2) the care must be rendered on behalf of an established patient rather than a new patient; (3) the NPP must be acting solely in accordance with the existing treatment as devised by the supervising physician; and (4) the NPP must be an employee of the same practice as the supervising physician.

17. Health care providers also rely on a standardized set of five-digit codes called Current Procedural Terminology ("CPT"), which are developed by the American Medical Association to describe various diagnostic and health procedures for billing purposes. The use of a code that misrepresents the nature of services provided to justify a higher rate of reimbursement is a typical hallmark of billing fraud referred to in the industry as "upcoding."

18. Providers also commonly rely on coding modifiers, two-character codes of numbers or letters that are appended to CPT codes, to report an additional evaluative tool used on a patient by the same physician on the day of a coded procedure. Modifiers are tools that permit coders to bypass billing edit features that are designed to detect improper payments. Misuse of modifiers often draws scrutiny from federal regulators.

19. Mental health care providers are subject to restrictions regarding care time intervals. Inflating the time provided for services, documenting initial evaluations as therapy sessions, or billing for services that did not actually meet minimum time for reimbursement are signs of fraudulent billing.

## Stewart's efforts to stop fraudulent government billing practices at Golden Victory

20. In Stewart's first few months as CEO, as part of his assessment of Golden Victory's operations, he recognized immediate signs of flaws in the coding and billing processes at the company's clinics.

21. Given the clear risk that any hint of fraud poses to a health care provider, in February 2022, Stewart authorized general counsel Edward Maggio to hire an independent third party to conduct a systematic audit of the coding and billing processes within the organization. Health Information Associates ("HIA"), a leader in the health care compliance field, was chosen to conduct the audit.

22. Shortly after commissioning the audit, in late February, Stewart learned that the Las Vegas Golden Victory Clinic had been notified in December 2021 by Medicare that the agency was suspending payments to the clinic due to evidence of overbilling. Under the terms of the suspension, claims would be

processed but the proceeds would be placed in an escrow account pending resolution of an inquiry by CMS as well as the Internal Revenue Service ("IRS").

23. Remarkably, the CEO of Golden Victory was initially not informed that one of the company's clinics was the target of a federal civil investigation. Luthor and Brown and their personal attorneys had engaged with the IRS and CMS for three months without informing Stewart. He learned the details of the investigation and suspension only after being provided the CMS initiating letter by the CEO of Golden Victory's third-party billing company, ReveSolv.

24. As the Las Vegas clinic grappled with the CMS/IRS investigation, HIA spent approximately eight weeks performing the audit Stewart commissioned. On April 28, 2022, HIA presented the executive summary of the results to Stewart and Maggio, who in turn scheduled a full-scale virtual presentation to the ownership team of Luthor and Brown on May 2, 2022.

25. The results of the 54-page HIA audit were devastating. As a topline conclusion, the audit determined that the coding and billing accuracy levels were in the 32.44% range, in comparison with an industry gold standard of 95%.

26. The depth of the errors uncovered was sweeping. They included consistently erroneous CPT code usage, inadequate documentation to support coding assignments, improper use of telehealth practices, use of NPPs to perform

service coded to physicians, misuse of the incident-to standard, frequent errors in the coding process for neurofeedback, and incorrect documentation of time increments.

27. Stewart realized that the medley of errors uncovered in the audit created a threat of recoupment from government providers and regulatory scrutiny as well as civil and criminal liability, and strongly communicated these risks in the May 4 virtual call with the ownership.

28. Given the gravity of the risk identified, Stewart proposed adopting an aggressive remediation strategy, including a potential pause in billing activity until immediate corrective action could be put in place.

29. Luthor and Brown stunned Stewart with their lack of concern. Both claimed that a prior audit had uncovered no fundamental coding and billing problems, but they declined to identify the auditor or share the findings. They emphatically rejected the idea of a billing pause as too costly.

30. Undeterred by the owners' reaction, Stewart developed a comprehensive strategy to mitigate the myriad compliance issues. He directed the executive leadership team—which consisted of the general counsel Maggio; the director of operations, Chanell Allen; and the director of professional services,

Stacy Ballard—to draft a remediation plan. The clinical staff was given a companywide briefing in a conference call on May 9.

31. In mid-May, Stewart formally recommended to Luthor and Brown that the company terminate its relationship with ReveSolv on the grounds that it had failed to exercise adequate oversight of billing procedures. Luthor rejected the idea and openly proposed a strategy to keep ReveSolv on board until the CMS/IRS investigation ended in Nevada but to deceptively plant the seed with regulators that ReveSolv was the source of any billing irregularities.

32. While Stewart perceived ReveSolv as ineffective, he firmly resisted the deflection tactic Luthor embraced on the grounds that Golden Victory's focus should be on restoring integrity to its billing practice. Luthor was not fazed and stood by his plan to falsely blame the third-party biller in the interests of avoiding legal exposure.

**Retaliatory termination**

33. At the same time Stewart was forming strategies to mitigate a pattern evidence of widespread irregularities, the director of operations Chanell Allen engaged in several covert calls with Luthor and Brown to share information about the progress of Stewart's remediation effort. Allen's scheme to bypass the CEO was unmistakably aimed at undermining Stewart's compliance agenda.

34. On June 1, 2022, within approximately two weeks of Stewart's disagreement with Luthor over the path forward given the evidence of billing irregularities and three weeks after Stewart took substantial steps to stop a pattern of widespread billing and coding violations, Brown, the other co-owner, suddenly notified Stewart that he was being terminated immediately. The ostensible grounds were that there were allegations against Stewart of "racism and sexism" from "multiple employees" and that there was reason to believe Stewart had falsified company timekeeping records.

35. Golden Victory's personnel handbook contains a detailed protocol for investigating employee allegations regarding their chain of command. The company did not follow its handbook or initiate any interview or evidence-gathering from Stewart.

36. Stewart was given no opportunity to rebut or address these claims, which the owners presented to him for the first time on the day of his termination, within weeks after he took aggressive steps to combat billing and coding irregularities.

37. Despite the litany of sudden allegations Brown leveled at Stewart in the call terminating him, the written notice of termination invoked Section 14(a) of

Stewart's employment agreement, executed effective November 9, 2021, which provides for separation by mutual written agreement.

38. Under the terms of the agreement, a separation or termination within one year of hire that is not for cause creates the obligation of payment of the base salary for a period of six months. *See* Attachment A, Section 14(c)(ii). Stewart was therefore entitled to continuing compensation based on his base salary of $250,000 until December 2022.

39. Separation by "mutual agreement" is by definition not a termination for cause, the sole criteria in the agreement for voiding the obligatory payment schedule in 14(c)(ii). But rather than honor the terms of Stewart's employment agreement, Golden Victory offered Stewart a "lump sum equal to [Stewart's] pay rate for eight weeks (40 business days)." For Stewart, the promised severance would have equaled roughly $38,461.00, less than a third of the $125,000 severance promised in Stewart's agreement.

40. In addition to the economic loss, Golden Victory's termination of Stewart has created immediate and sustained reputational damage, which is exacerbated by the company's insinuation to several employees and stakeholders that the firing was linked to ethical or discriminatory behavior by Stewart, part of a continuing effort to conceal a retaliatory motive and to discredit Stewart.

41. Since Stewart's termination, Golden Victory has brought to an abrupt halt the remediation process Stewart launched to curb coding and billing irregularities, despite uncontroverted evidence of systemic fault. Eliminating Stewart removed the most powerful internal source of resistance to a pattern of fraudulent practices that the ownership of the company has tolerated if not sanctioned.

## COUNT I
### (Violation of the Retaliation Provision of the False Claims Act, 31 U.S.C.A. §3730 (h)(1)

42. Plaintiff incorporates by reference paragraphs 1-41 of this complaint.

43. Plaintiff's actions in uncovering evidence of systematic fraudulent billing and coding practices practiced by Defendant and his subsequent remedial efforts to eliminate such fraudulent practices, as described herein at ¶¶ 20-31, constitute protected activity under the False Claims Act in that Plaintiff made efforts to stop 1 or more violations of the Act.

44. Defendant knew that Plaintiff engaged in said protected activity.

45. Defendant subsequently retaliated against Plaintiff by terminating him solely because he engaged in said protected activity.

46. Defendant's retaliatory conduct has inflicted damages on Plaintiff, including but not limited to two times the loss of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation, including damages for emotional distress and mental anguish, costs of litigation, and attorneys' fees.

## COUNT II
### (Breach of Contract)

47. Plaintiff incorporates by reference paragraphs 1-46 of this complaint.

48. Defendant's failure to honor the terms of its employment agreement regarding compensation in the event of a mutually agreed-upon termination was contrary to and in breach of its contract with Plaintiff.

49. Defendant's offered terms of compensation in the event of termination were substantially less than the contracted terms.

50. As a result of Defendant's breach of contract, Defendant owes Plaintiff back wages commensurate with the terms of his employment agreement.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits, including liquidated damages;

B. Compensatory damages to the extent allowed by law;

C. Punitive damages to the extent allowed by law;

D. Attorneys' fees and costs of litigation;

E. Prejudgment and post-judgment interest at the highest lawful rate; and

F. Such other equitable and monetary relief as the Court deems just and proper.

Respectfully submitted on the 31st day of August 2022.

**HKM Employment Attorneys LLP**

*s/Emma Denny*
Emma Denny
MN Bar Number 395334
222 South 9th St. Suite 430
Minneapolis, MN 55402
800-791-1007
edenny@hkm.com

*s/Artur Davis*
Artur Davis[2]
(admitted in Alabama)
ASB-3672-D56A
2024 3rd Ave. North, Suite 307
Birmingham, AL 35203
205-881-0935
adavis@hkm.com

---

[2] Mr. Davis will promptly file for admission to practice *pro hac vice* in this cause of action.