## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Bryan Stewart,                                    File No. 22-cv-2145 (ECT/LIB)

      Plaintiff and Counter-Defendant,

v.                                                **OPINION AND ORDER**

Golden Victory Medical LLC,

      Defendant and Counter-Claimant.

Emma Denny, HKM Employment Attorneys, LLP, Minneapolis, MN, and Artur Davis, HKM Employment Attorneys, Birmingham, AL, for Plaintiff Bryan Stewart.

Defendant Golden Victory Medical LLC, *pro se*.

Plaintiff Bryan Stewart filed this lawsuit against Defendant Golden Victory Medical LLC alleging retaliation under the False Claims Act and breach of contract. After less than a year, Golden Victory's counsel moved to withdraw. The motion was granted, but Magistrate Judge Brisbois ordered Golden Victory to retain new counsel within thirty days. Golden Victory has not retained new counsel or explained its failure to abide by that order. Because organizations are unable to represent themselves in court, Stewart requested, and received, an entry of default from the clerk's office under Federal Rule of Civil Procedure 55(a). Stewart now moves for default judgment under Rule 55(b).

The basic process for determining whether a default judgment should be entered is straightforward. (1) The entry of default means that "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." 10A

C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* § 2688.1 (4th ed. & April 2023 Update) (footnotes omitted).  (2) Next, it must be determined whether the taken-as-true factual allegations of the complaint "constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law."  *Marshall v. Baggett*, 616 F.3d 849, 852 (8th Cir. 2010) (quoting *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010)).  (3) If the taken-as-true allegations of the complaint constitute a legitimate cause of action, then the amount of the default judgment must be ascertained.  *See Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1042 (8th Cir. 2000).

I

Start with the factual allegations of Stewart's Complaint that will be taken as true. Golden Victory is a "privately held Nevada-based limited liability company that operates five clinics in four states" and specializes in mental-health services.  Compl. [ECF No. 1] ¶ 7.  The co-owners of Golden Victory are Gabriel Luthor and Elizabeth Brown.  *Id.* ¶ 8. Approximately 65% of Golden Victory's patients are Medicare or Medicaid beneficiaries. *Id.* ¶ 11.  The Centers for Medicare & Medicaid Services ("CMS") provides "detailed criteria for the reimbursement of providers for services covered by Medicare and Medicaid."  *Id.* ¶ 12.

In November 2021, Stewart entered into an Employment Agreement (the "Agreement") with Golden Victory.  *See* ECF No. 1-1.  Stewart, a nationally recognized expert in the field of health services management, was hired as the first Chief Executive Officer of Golden Victory.  Compl. ¶¶ 9–10.  After starting as Golden Victory's CEO, Stewart quickly recognized flaws in the coding and billing processes at the organization's

2

clinics. *Id.* ¶ 20.  In February 2022, he authorized Golden Victory's general counsel to hire an independent third party to conduct a systematic audit of the organization's coding and billing processes. *Id.* ¶ 21.  Shortly thereafter, Stewart learned that one of Golden Victory's clinics "had been notified in December 2021 by Medicare that the agency was suspending payments to the clinic due to evidence of overbilling." *Id.* ¶ 22.  Payments to the clinic were placed in escrow pending an inquiry by the CMS and Internal Revenue Service ("IRS"). *Id.*  Luthor, Brown, and their personal attorneys had engaged with the government agencies for three months without informing Stewart about the inquiries. *Id.* ¶ 23.

On April 28, 2022, the third-party auditor presented an executive summary of the audit's results to Stewart. *Id.* ¶ 24.  The audit found sweeping errors, including: "coding and billing accuracy levels . . . in the 32.44% range, in comparison with an industry gold standard of 95%," *id.* ¶ 25, inadequate documentation to support coding assignments, "frequent errors in the coding process for neurofeedback, and incorrect documentation of time increments," *id.* ¶ 26.  The report also found clinics incorrectly coded nonphysician-provider services as physician services (allowing for a higher reimbursement rate), and misused the "incident-to" standard, a rule that allows nonphysician providers to bill at a higher rate when the initial patient visit is performed by a supervising physician, *id.* ¶¶ 13–16, 26.

Stewart recognized that these errors put Golden Victory at risk of civil and criminal liability, "and strongly communicated these risks in [a] May 4 virtual call with the ownership." *Id.* ¶ 27.  He proposed an "aggressive remediation strategy, including a potential pause in billing activity until immediate corrective action could be put in place."

*Id.* ¶ 28. "Luthor and Brown stunned Stewart with their lack of concern." *Id.* ¶ 29. The owners claimed a prior audit contradicted the independent auditor's findings, "but they declined to identify the auditor or share the findings." *Id.* The owners also "rejected the idea of a billing pause as too costly." *Id.*

Undeterred, Stewart developed a "comprehensive strategy" to mitigate the compliance issues. *Id.* ¶ 30. He directed the executive leadership team to draft a remediation plan and gave clinical staff a companywide briefing in a conference call on May 9. *Id.* ¶ 30. Stewart formally recommended to Luthor and Brown that Golden Victory terminate its relationship with its third-party billing company, but Luthor rejected this idea. *Id.* ¶ 31.

While Stewart sought to mitigate the widespread billing irregularities, Golden Victory's director of operations reported Stewart's remediation efforts to Luthor and Brown. *Id.* ¶ 33. On a June 1, 2022 Zoom call, Brown told Stewart that he was being terminated immediately, citing allegations of "racism and sexism" and claiming Stewart had falsified timekeeping records. *Id.* ¶ 34; *see also* ECF No. 58-1 at 33.[1] Though the Complaint is not explicit on the point, Stewart made clear during his evidentiary-hearing testimony that he denies the allegations of racism and sexism leveled against him. ECF No. 58-1 at 34–35, 44, 52. Golden Victory did not follow its personnel handbook for investigating employee allegations, interview Stewart, or gather any evidence from him. Compl. ¶ 35. Stewart was not given an opportunity to respond to these claims, which the

---

[1]     Page cites are to CM/ECF pagination appearing in a document's upper right corner, not to a document's original pagination.

owners presented to him "for the first time on the day of his termination." *Id.* ¶ 36. After Stewart's termination, Golden Victory abruptly halted the remediation process Stewart had launched to curb coding and billing irregularities. *Id.* ¶ 41.

Despite terminating Stewart over Zoom without prior notice, a written notice of termination purported to invoke § 14(a) of the Agreement, which provides for separation by mutual written agreement. *Id.* ¶ 37. Under the Agreement, Golden Victory could terminate Stewart without cause "provided the Company continue[d] to make [base salary] payments for six (6) or twelve (12) months respectively from the date of notice pursuant to this Section." ECF No. 1-1 § 14(c)(ii). Stewart's base salary was $250,000, but Golden Victory only offered Stewart a lump sum equaling eight-weeks' pay, totaling roughly $38,461.00. Compl. ¶ 39.

Stewart brought this two-count lawsuit on August 31, 2022. *See* Compl. Count I is a retaliation claim under the False Claims Act. *Id.* ¶¶ 42–46. Count II is a breach-of-contract claim. *Id.* ¶¶ 47–50. Golden Victory counterclaimed for breach of contract and tortious interference with contract. ECF No. 9.

In May 2023, Golden Victory moved to stay prosecution of the case because of an active federal investigation targeting Brown, Luthor, and Golden Victory. ECF No. 19. The motion to stay was denied. ECF No. 29. Golden Victory's attorney, Mr. Kallenbach, then moved to withdraw, stating Brown and Luthor refused to cooperate with him to defend the case. ECF Nos. 30, 32. On September 22, 2023, Magistrate Judge Brisbois granted the motion to withdraw, leaving Golden Victory unrepresented. ECF No. 40. Mr. Kallenbach was ordered to serve Luthor and Brown a copy of the order as soon as

practicable and to file a certificate of service. *Id.* at 7. Golden Victory was ordered to "[a]s soon as practicable thereafter and in any event by no later than thirty (30) days after service of the present Order . . . [to] have its substitute counsel enter a notice of appearance in the present action." *Id.*

Stewart applied to the clerk's office for an entry of default in early December, ECF No. 43, and the clerk's office entered default against Golden Victory on December 4, 2023, ECF No. 44. Stewart then moved for default judgment. ECF No. 45. Mr. Kallenbach, however, did not initially receive notice of Judge Brisbois's September 22, 2023 Order granting his motion to withdraw, instead only learning about the Order on December 13, 2023. ECF No. 51 at 1–2. Mr. Kallenbach filed a certificate of service on January 3, 2024. ECF No. 52. Golden Victory remains unrepresented.

## II

### A

Stewart's first claim is for retaliation under the False Claims Act. Enacted in 1863, the False Claims Act "was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War." *United States v. Bornstein,* 423 U.S. 303, 305 n.1, 309 (1976). The FCA imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). For purposes of the statute, "knowingly" includes a person who "has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless

6

disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)–(iii). "The FCA attaches liability, not to the underlying fraudulent activity, but to the claim for payment." *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1070 (8th Cir. 2016). "Qui tam provisions permit private persons, relators, to sue for violations in the name of the United States and to recover part of the proceeds if successful." *United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1163 (8th Cir. 2019) (citing 31 U.S.C. § 3730(b), (d)).

To protect insiders who might be "reluctant to use these *qui tam* provisions due to fear of employer backlash, the False Claims Act protects whistleblowers from employer retaliation." *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 738 (10th Cir. 2019). The FCA protects employees from being discharged or otherwise retaliated against "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). To establish a retaliation claim under the FCA, a "plaintiff must prove that (1) the plaintiff was engaged in conduct protected by the [False Claims Act]; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity." *Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 470 (8th Cir. 2016) (quoting *Schell v. Bluebird Media, LLC,* 787 F.3d 1179, 1187 (8th Cir. 2015)). The taken-as-true allegations establish a retaliation claim.

(1) An employee's activity is protected when the employee's actions satisfy two conditions. *Schuhardt v. Wash. Univ.*, 390 F.3d 563, 567 (8th Cir. 2004). First, "the

employee's conduct must have been in furtherance of an FCA action," *id.*, or (after the 2009 amendment to the FCA) the employee must "lawfully try to stop one or more violations of the Act . . . , without regard to whether their conduct advances a private or government lawsuit under the Act." [2] *Reed*, 923 F.3d at 765. Second, an employee must (1) believe in good faith; and (2) "a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 933 (8th Cir. 2002) (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.,* 275 F.3d 838, 845 (9th Cir. 2002)).

Stewart engaged in lawful acts to stop Golden Victory's overbilling practices by authorizing an independent third party to conduct an audit, proposing a pause in billing activity, recommending the owners terminate Golden Victory's third-party billing company, and directing the executive leadership team to draft a remediation plan. And Stewart's subjective belief that Golden Victory was defrauding the government was objectively reasonable, given pending government inquiries into Golden Victory's billing practices and a 54-page independent report finding systematic billing and coding errors. *See Lord v. Univ. of Mia.*, 571 F. Supp. 3d 1299, 1311 (S.D. Fla. 2021) (concluding that a Chief Compliance Officer's belief that a university laboratory was violating the FCA by overbilling Medicare, a belief grounded in a third-party report, was objectively reasonable); *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 994 (D. Minn. 2013) (alleged

---

[2]     "The opposition clause was added by Congress in 2009, and the Eighth Circuit has not articulated a distinct test to determine when this clause is satisfied." *Sherman v. Berkadia Com. Mortg. LLC*, No. 4:17 CV 2183 RWS, 2019 WL 195125, at *7 (E.D. Mo. Jan. 15, 2019), *aff'd,* 956 F.3d 526 (8th Cir. 2020).

violations of Medicare and Medicaid, including overbilling and improper coding, could lead to a viable claim under the FCA). Therefore, Stewart's efforts to stop Golden Victory's overbilling practices were protected under § 3730(h)(1).

(2) Deciding if Stewart's employer had notice of his protected conduct implicates a preliminary question—the heightened notice standard for compliance employees. The Eighth Circuit has spoken little on the issue. In a pre-amendment footnote, it reasoned that "[a]n employee tasked with the internal investigation of fraud against the government cannot bring a § 3730(h) action for retaliation unless the employee makes it clear that her actions go beyond the assigned task." *Schuhardt*, 390 F.3d at 568 n.2. The Seventh Circuit has described the reasoning behind this rule. When a compliance employee alerts supervisors to regulatory violations, this does "not necessarily put [the company] on notice that [the employee] was planning to take a far more aggressive step and bring a *qui tam* action against them or report their conduct to the government." *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 945 (7th Cir. 2002). In other words, an employee's conduct within the scope of their duties generally does not put their employer on notice the employee is acting in furtherance of a *qui tam* action. *See Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567 (6th Cir. 2003) ("[The plaintiff] was simply performing his ordinary duties as a supervisor of laboratory testing. [The defendant] cannot be charged with notice on this basis.").

But courts disagree whether the heightened standard survives the 2009 amendment to the FCA. Since then, several courts have applied the heightened standard without analyzing this issue. *See, e.g.*, *Tener v. Mercy Health Servs.-Iowa, Corp.*, No. 22-CV-

4025-CJW-MAR, 2022 WL 2972219, at *4 (N.D. Iowa July 27, 2022); *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 908 (9th Cir. 2017) ("Courts have held that when an employee is tasked with such investigations, it takes more than an employer's knowledge of that activity to show that an employer was on notice of a potential *qui tam* suit."); *Omwenga v. United Nations Found.*, 244 F. Supp. 3d 214, 220 (D.D.C. 2017).  The Tenth Circuit held the rule continues to apply, reasoning:

> [I]n these decisions, we recognized that an employer might reasonably presume that when a compliance employee reports incidents of fraud she is just doing her job.  So to hold an employer liable under the Act's whistleblower provisions, our pre-2009 precedent required a compliance employee to overcome that presumption by showing that she was engaging in protected activity, not just doing her job.
>
> We think this reasoning has survived the 2009 amendment.  True, as we have explained above, that amendment expanded the scope of protected activity and thus expanded the universe of conduct that a relator may plead in giving the employer notice of the protected activity.  But nothing about the 2009 amendment undercuts the rationale of our precedent addressing compliance officers who are charged by their employer with investigating fraud.  *See United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 908 (9th Cir. 2017) (deeming our pre-2009 *Ramseyer* decision "instructive," in a post-amendment context, on the point that compliance employees must do more to show an employer's knowledge), *cert. denied*, ⸺ U.S. ⸺, 139 S.Ct. 783, 202 L.Ed.2d 566 (2019).
>
> In sum, to state a retaliation claim, as relevant here, an employee's complaint must allege facts that show her employer knew of her efforts to stop a False Claims Act violation.  The 2009 amendment left intact our precedent requiring compliance employees to do more than other employees to meet the notice element.

*Reed*, 923 F.3d at 767.  But other courts have questioned the continued soundness of the heightened standard.  After all, the rule was created to ensure "that the employer was on notice of an employee's intentions of *bringing or assisting in an FCA action*, whereas the 2009 amendments broadened the scope of the FCA's whistleblower provision to protect against retaliation in cases where the employee was engaged *in efforts to stop an FCA violation*, even if those efforts were not necessarily in furtherance of an FCA claim." *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 299 (E.D.N.Y. 2016) (cleaned up); *see also Malanga v. NYU Langone Med. Ctr.*, No. 14cv9681, 2015 WL 7019819, at *3 (S.D.N.Y. Nov. 12, 2015); *Lord v. Univ. of Mia.*, No. 13-22500-CIV-ALTONAGA/McAliley, 2022 WL 4767772, at *16–17 (S.D. Fla. Aug. 8, 2022).

This questions need not be resolved here because, even if the heightened pleading standard applied, Stewart's conduct was sufficient to put Golden Victory's owners on notice that his activity was protected.[3]  "[T]o provide actual or constructive knowledge,

---

[3]   There are sound reasons to think the heightened standard no longer applies.  Under the pre-amendment statute, the heightened notice standard made sense.  An employee's performance of her monitoring and reporting activities would not "put defendants on notice that she was acting 'in furtherance of' an FCA action—*e.g.,* that she was furthering or intending to further an FCA action rather than merely warning the defendants of the consequences of their conduct."  *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996).  But after the 2009 amendment to the FCA, nothing stops a compliance employee's acts, within the scope of her duties, from putting an employer on notice that her activities are efforts to stop a violation of the FCA.  When an employer is aware of ongoing FCA violations (or potential violations) and knows about an employee's efforts to stop those violations, the better answer might be that the notice requirement is satisfied regardless of whether the employee's efforts fall within the scope of her duties.  Regardless, as noted, there is no reason to resolve this question here, and doing so would seem especially unwise considering the one-sided nature of the default-judgment motion.

employees must connect the alleged misconduct to fraudulent or illegal activity or the FCA." *Strubbe*, 915 F.3d at 1168. Stewart presented the results of the third-party audit to Luthor and Brown on a virtual call. During that presentation, he strongly communicated the risks of civil and criminal liability. The IRS and CMS inquiries also put the owners on notice that their billing practices exposed them to liability. And not only did Stewart inform the owners directly about his ongoing remediation efforts, but a different member of the executive leadership team also reported this same information to the owners. Compl. ¶¶ 27–28, 31, 33. Finally, as Golden Victory's CEO, Stewart's responsibilities were company-wide; he was not a traditional quality control or compliance employee, meaning his active efforts to resolve Golden Victory's billing practices did not fall explicitly within his job duties. *See Lord*, 2022 WL 4767772, at *16–17 ("Highly relevant to this analysis is the nature of Plaintiff's executive roles at the University. No manual dictated Plaintiff's compliance responsibilities; he was a high-ranking executive with discretion to define his own role and set policy. . . . And without any clear baseline for what Plaintiff's 'typical' responsibilities were, the Court cannot lightly infer that any particular action he took to root out fraud was professionally unremarkable.").

(3) "Retaliatory acts under the FCA include discharging, demoting, suspending, threatening, harrassing [sic], or otherwise discriminating against an employee." *Strubbe*, 915 F.3d at 1169. Here, this is satisfied by Golden Victory discharging Stewart.

(4) Stewart must show his discharge "was motivated solely by [his] protected activity." *Schell v. Bluebird Media, LLC*, 787 F.3d 1179, 1187 (8th Cir. 2015). "[A] finding of dual motive exonerates the employer." *Norbeck v. Basin Elec. Power Coop.*,

215 F.3d 848, 851 (8th Cir. 2000).  Because Brown and Luthor terminated Stewart shortly after his efforts to stop widespread billing irregularities, rejected Stewart's proposals to pause billing and terminate Golden Victory's third-party billing company, and halted Stewart's remediation initiatives after terminating him, the taken-as-true allegations satisfy causation.  And Stewart adequately alleges that Golden Victory's stated reasons for termination—accusations of workplace misconduct—were pretextual.  *See Townsend v. Bayer Corp.*, 774 F.3d 446, 457 (8th Cir. 2014) ("When an employee presents evidence showing an employer's stated reason for taking an adverse action against him is pretextual, such evidence also serves to prove retaliation.").

B

Stewart's second cause of action is breach of contract.  Under Minnesota law, a breach-of-contract claim requires: "(1) a valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the contract by the defendant; and (4) damages."  *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 989 (D. Minn. 2006) (citation omitted); *see Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011) (same).  Deciding if Stewart's Complaint meets all four elements requires interpreting the contract.  "[T]he primary goal of contract interpretation is to determine and enforce the intent of the parties."  *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs.*, 913 N.W.2d 687, 692 (Minn. 2018) (alteration in original) (quoting *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003)).  "When the language of the contract is unambiguous, it should be given its plain meaning."  *Minn. Jud. Branch v. Teamsters Loc. 320*, 971 N.W.2d 82, 88 (Minn. Ct. App. 2022).

The Agreement, attached to the Complaint, is a valid employment contract. *See* ECF No. 1-1; Compl. ¶ 9.

The second element, performance of any conditions precedent, requires some analysis. A condition precedent is "any fact or event, subsequent to the making of a contract, which must exist or occur before a duty of immediate performance arises under the contract." *Nat'l City Bank of Minneapolis v. St. Paul Fire & Marine Ins.*, 447 N.W.2d 171, 176 (Minn. 1989). "[I]f the event required by the condition does not occur, there [is] no breach of contract." *Capistrant v. Lifetouch Nat'l Sch. Studios, Inc.*, 916 N.W.2d 23, 27 (Minn. 2018) (quoting *451 Corp. v. Pension Sys. for Policemen & Firemen*, 310 N.W.2d 922, 924 (Minn. 1981)). "[N]o particular code words [are] needed to form an express condition." *Carl Bolander & Sons. v. United Stockyards Corp.*, 215 N.W.2d 473, 434 (1974).

Under the Agreement, Golden Victory is only obligated to provide severance compensation if Golden Victory terminates Stewart without cause. ECF No. 1-1 § 14(c)(ii) ("In the event that [Golden Victory] provides notice of termination without cause, [Stewart] will receive as termination compensation . . . a Base Salary for a period of six (6) months from the date of notice."). The taken-as-true allegations describe a termination without cause. Golden Victory fired Stewart relying on the pretext of misconduct. *See* Compl. ¶¶ 34–37, 41. It invoked § 14(a) in its written notice of termination, *id.* ¶ 37, the provision governing a termination by mutual written agreement, despite unilaterally terminating Stewart, *id.* ¶ 34. Because Golden Victory did not have a valid reason to terminate Stewart under the Agreement and its stated reasons for termination were pretextual, Stewart's

14

termination is best categorized as termination without cause under § 14(c).  Therefore, Golden Victory was required "to make payments for six . . . months . . . from the date of notice pursuant to this Section."  ECF No. 1-1 § 14(c)(ii).

Section 14(c)(iii) provides another condition to Golden Victory's severance obligation: "The right to the foregoing termination compensation . . . is subject to the Employee's execution of [Golden Victory's] severance agreement."  ECF No. 1-1 § 14(c)(iii).  The phrase "subject to" expressly conditions Golden Victory's contractual duty to pay severance compensation on Stewart's execution of Golden Victory's severance agreement.  Therefore, it is fair to treat Stewart's execution of the severance agreement as a condition precedent to Golden Victory's contractual duty in § 14(c)(ii).

Nonetheless, Stewart was excused from complying with this condition precedent because Golden Victory repudiated its contractual obligations.  "It is basic hornbook law that an unconditional repudiation of a contract, either by words or acts, which is communicated to the other party prior to the time fixed by the contract for his performance constitutes an anticipatory breach."  *Matter of Haugen*, 278 N.W.2d 75, 79 n.6 (Minn. 1979).  And "[i]t is elementary that a breach of a contract by one party excuses performance by the other."  *Soderbeck v. Ctr. for Diagnostic Imaging, Inc.*, 793 N.W.2d 437, 441 (Minn. Ct. App. 2010) (quoting *Wasser v. W. Land Secs.*, 107 N.W. 160, 162 (Minn. 1906)).  In other words, "a repudiation of the contract by one party relieves the other party of the duty to perform any conditions precedent that may exist to the performance of the repudiator." 13 Williston on Contracts § 39:39 (4th ed. May 2023 Update).  Golden Victory only offered Stewart $38,461 instead of the $125,000 it owed.  This offer repudiated its contractual

obligation to pay $125,000 in severance to Stewart.  By repudiating its contractual obligations, Golden Victory breached the Agreement and excused Stewart from the condition of executing the severance agreement.  Golden Victory's failure to pay $125,000 to Stewart is a material breach of the Agreement that caused damages—the failure to receive an amount owed.  Therefore, Stewart's taken-as-true allegations satisfy all four elements of breach of contract.

### III

Even after a defendant's liability is established, a plaintiff seeking a default judgment "must still prove its actual damages to a reasonable degree of certainty." *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818–19 (8th Cir. 2001).  "A district court may determine damages by computing from the facts of record the amount that the plaintiff is lawfully entitled to recover and enter judgment accordingly." *Radisson Hotels Int'l, Inc. v. Fairmont Partners LLC*, No. 19-cv-1176 (WMW/BRT), 2020 WL 614810, at *2 (D. Minn. Feb. 10, 2020).  Stewart requests $898,333 in backpay, $55,612 in prejudgment interest on the backpay, $250,000 in emotional-distress damages, $25,662.50 in attorneys' fees, $5,902.65 in litigation costs, and $1,235,510.10 in liquidated damages under the False Claims Act.  ECF No. 57 at 26.  As for his breach-of-contract claim, Stewart seeks $125,000 in unpaid severance. *Id.* at 27.  Take each request in turn.

(1) Stewart's request for $898,333 in backpay will be granted in part.  Relief under the FCA "shall include . . . 2 times the amount of back pay." *See* 31 U.S.C. § 3730(h)(2). Backpay is "[t]he wages or salary that an employee should have received but did not because of an employer's unlawful action in setting or paying the wages or salary."

*Backpay*, Black's Law Dictionary (11th ed. 2019).  In general, "[t]he back pay period begins with the date of lost earnings and ends on the date of the court's decision, unless this period is terminated by some other event."  2 Paul H. Tobias, *Litigating Wrongful Discharge Claims* § 8:9 (June 2023 Update).  "[M]easuring backpay always involves some level of speculation, and so backpay calculations 'need not be precise; exactness is not expected.'"  *Geraty v. Vill. of Antioch*, No. 09 C 6992, 2014 WL 1475574, at *2 (N.D. Ill. Apr. 15, 2014) (quoting *EEOC v. Custom Cos.*, Nos. 02 C 3768, 03 C 2293, 2007 WL 734395, at * 12 (N.D. Ill. Mar. 8, 2007)).[4]

Normally, courts calculate backpay by relying on a plaintiff's compensation history. *See, e.g.*, *E.E.O.C. v. MSDS Consultant Servs., LLC*, No. 8:18-cv-02917-PX, 2021 WL 6074204, at *3 (D. Md. Dec. 22, 2021); *Barnes v. Dep't of Corr.*, No. 18-cv-105-jdp, 2020 WL 94799, at *3 (W.D. Wis. Jan. 8, 2020); *Phillips v. City of S. Bend*, No. 3:15CV527-PPS, 2018 WL 2041798, at *5–9 (N.D. Ind. May 1, 2018); *Palmer v. Richard L. Schlott, Realtors, Inc.*, CIV. No. 88-4028 (CSF), 1990 WL 86092, at *4 (D.N.J. June 20, 1990). That method runs into challenges here.  Stewart's base salary for 2022 was $250,000, ECF No. 59-1 at 19, but he could have received an additional $250,000 if he met certain

---

[4]     When awarding backpay under Title VII, "ambiguity in what the claimant would have received but for discrimination should be resolved against the discriminating employer."  *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 799 (6th Cir. 2018) (quoting *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 628 (6th Cir. 1983)); *E.E.O.C. v. Wal-Mart Stores, Inc.*, No. 17-cv-739-jdp, 2020 WL 1527324, at *2 (W.D. Wis. Mar. 31, 2020) (same); *Mead v. U. S. Fid. & Guar. Co.*, 442 F. Supp. 114, 134 (D. Minn. 1977) (same).  Although the False Claims Act is not an anti-discrimination statute, because an award of backpay under the FCA serves a related make-whole purpose, it makes sense to apply a similar presumption here.

incentive targets, *id.* Those incentive targets included quarterly business goals and an end-of-year growth target. ECF No. 59-1 at 17; ECF No. 58-1 at 39. For 2022, the quarterly incentive was $37,500 per quarter (for a maximum of $150,000), and his end-of-year incentive was $100,000. ECF No. 59-1 at 17. Although Stewart met his first quarterly goal for 2022, it is not clear whether he would have continued to meet his quarterly goals or meet his end-of-year target. *See* ECF No. 58-1 at 36–40. This means Stewart's base pay was $250,000, but his maximum compensation for 2022 was $500,000.

Dr. Jones, Stewart's damages expert, calculates a backpay award based on the maximum. *See* ECF No. 58-1 at 7–8. That is speculative. It is possible, but not reasonably certain, that Stewart would have received the $100,000 end-of-year incentive. Stewart had only worked at Golden Victory for six months, so there is no compensation history of him receiving it. Because Stewart was terminated in June, seven more months would have passed before it could be determined if he met or failed the requirements. On the other hand, a backpay award based solely on Stewart's $250,000 base salary would not be consistent with the remedial purpose of the statute; half of Stewart's potential compensation was based on incentives. Moreover, Stewart achieved his first quarterly goal and anticipated meeting his remaining quarterly goals and end-of-year growth target. ECF No. 58-1 at 36–40. To balance these considerations, Stewart will be awarded backpay based on a $400,000 annual rate. This accounts for the likelihood that he would have been paid considerably more than $250,000 in annual compensation but takes into consideration

Stewart's limited compensation history and the inability to determine that he would have received (or was likely to receive) the maximum compensation amount.[5]

Therefore, Stewart will be awarded backpay as follows: $258,333.33 for 2022,[6] $400,000 for 2023, and $66,666.66 for 2024,[7] for a total backpay award of $725,000.[8]

(2) Stewart's request for $55,612 in prejudgment interest will be granted in part. Section 3730(h) entitles Stewart to "interest on the back pay." 31 U.S.C. § 3730(h)(2). "The appropriate general standard for the rate of prejudgment interest on [an FCA plaintiff's] back pay is the rate provided by 28 U.S.C. § 1961(a)." *Wilkins v. St. Louis Hous. Auth.*, 198 F. Supp. 2d 1080, 1090 (E.D. Mo. 2001), *aff'd*, 314 F.3d 927 (8th Cir. 2002). Dr. Jones calculates the compound prejudgment interest rates on backpay as follows: 8.26% for 2022, 5.93% for 2023, and 0.81% for 2024. ECF No. 58-1 at 9. Applying these rates to the backpay award results in the following amounts of prejudgment

---

[5]    Stewart's backpay award will not include any pay increases because there is insufficient evidence in the record to conclude that Stewart would have received a pay increase, and if so, what that pay increase might have been.

[6]    7/12 * $250,000 + $37,500 * 3.

[7]    2/12 * $400,000.

[8]    The award of back pay will not be reduced because of a failure to mitigate. First, "[t]he burden is upon the employer to prove a failure to mitigate." *Townsend v. Bayer Corp.*, 774 F.3d 446, 466 (8th Cir. 2014). By declining to defend this case, Golden Victory has not proven a failure to mitigate. Second, efforts to mitigate need not be successful, "but must represent an honest effort to find substantially equivalent work." *Id.* (quoting *Hartley v. Dillard's, Inc.,* 310 F.3d 1054, 1061 (8th Cir. 2002)). The record reflects an honest, unsuccessful attempt to find substantially equivalent work. ECF No. 58-1 at 43–45 (testifying that he has applied to more than 400 jobs).

interest: $21,338.33 for 2022, $23,720 for 2023, and $540 for 2024, for a total prejudgment interest award of $45,598.33.

(3) Stewart's request for $250,000 in emotional-distress damages will be granted. The False Claims Act entitles prevailing § 3730(h) plaintiffs to special damages, including emotional-distress damages. 31 U.S.C. § 3730(h)(2); *Townsend*, 774 F.3d at 466–67. "To prove emotional distress, medical or other expert evidence is not required." *Hammond v. Northland Counseling Ctr., Inc.*, 218 F.3d 886, 893 (8th Cir. 2000). A plaintiff's own testimony can suffice. *Id.* "However, a plaintiff must offer specific facts as to the nature of his or her claimed emotional distress and its causal connection to the allegedly violative actions." *Id.*

Stewart testified that he experienced "surprise, shock, fear, disappointment, [and] depression," after being terminated. ECF No. 58-1 at 52. He described long-lasting impacts, including insomnia, *id.* at 53, depression, *id.* at 54, the stress of financial insecurity, *id.* at 53, and strained relationships with his family, *id.* at 53–54. Based on my firsthand observations of Stewart's testimony, I find him both credible and convincing. And other evidence in the record supports the requested award. A letter from a close friend described Stewart "battling depression, anxiety, and a sense of hopelessness." ECF No. 59-1 at 21. His wife wrote, "I can't even describe the amount of rejection and pain he has endured. I've never seen him so discouraged and quite frankly hopeless, at times, about his future. He has cried and had severe nightly insomnia and digestive issues regularly." *Id.* at 23. Although compensating emotional distress with dollars is always an inexact science, Stewart's evidence is sufficient to award the requested $250,000. *See Townsend*,

774 F.3d at 466–67 (reducing an emotional-distress award to $300,000 based on similar evidence); *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551–53 (8th Cir. 2013) (affirming an award of $300,000 to each of two individuals who "testified to depression, extreme stress, worry, and sleeplessness"); ECF No. 58-1 at 69–78 (three jury verdicts awarding similar or greater amounts of emotional-distress damages in similar types of cases).

(4) Stewart's request for $25,662.50 in attorneys' fees will be granted in part. Under the False Claims Act, relief "shall include . . . compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C. § 3730(h)(2). The FCA is unusual in that attorneys' fees and litigation costs "are part and parcel" of special damages. *Hammond*, 218 F.3d at 894 (8th Cir. 2000). Nonetheless, an award of attorneys' fees is determined by using the traditional lodestar method. *See Townsend v. Bayer Healthcare Pharms., Inc.*, No. 5:11CV00055 JMM, 2012 WL 12874282, at *2 (E.D. Ark. Dec. 17, 2012), *aff'd sub nom. Townsend v. Bayer Corp.*, 774 F.3d 446 (8th Cir. 2014).

The party seeking attorneys' fees has the burden of establishing that the fees sought are reasonable and should submit evidence supporting the rates claimed and hours worked. *Hensley v. Eckerhart*, 461 U.S. 424, 433–34, 437 (1983). The lodestar amount is calculated by "multipl[ying] the number of hours reasonably expended by reasonable hourly rates." *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 529 (8th Cir. 2019). After the lodestar amount is determined, the court should consider whether it should be enhanced or reduced, which depends on the "important factor of the 'results obtained.'" *Hensley*, 461

U.S. at 434 (footnote omitted).   Trial-court judges need not "become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

Evidence of reasonable rates includes affidavits describing the qualifications and experience of the attorneys working on the case, "affidavits from other lawyers opining on the reasonableness of rates," and citations to fee awards in similar cases. *Bores v. Domino's Pizza LLC*, No. 05-cv-2498 (RHK/JSM), 2008 WL 4755834, at *6 (D. Minn. Oct. 27, 2008).  "When determining reasonable hourly rates, district courts may rely on their own experience and knowledge of prevailing market rates." *Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005).

Stewart requests an hourly rate of $495 and $550 for two partners, $250 for an associate, and $125 for a paralegal.  ECF No. 58-1 at 2–3.  Stewart does not provide affidavits describing the qualifications and experience of the attorneys, affidavits from other lawyers opining on the reasonableness of the requested fees, or citations to fee awards in similar cases.  An "itemization of the time spent," *id.* ¶ 4, describes the two partners, Emma Denny and Artur Davis, as having ten and sixteen years of experience, and the associate as having two years of experience, *id.* at 2–3.  Although the partners' rates are not extraordinarily high for the Minnesota market, *see Sanders v. BNSF Ry. Co.*, No. 17-cv-5106 (ECT/JFD), 2022 WL 17414504, at *12 (D. Minn. Dec. 5, 2022) (finding $350 to $775 per hour reasonable); *Fancher v. Klann*, No. 13-cv-435 DSD/JJK, 2015 WL 1810235,

at *2 (D. Minn. Apr. 21, 2015) (finding $225 to $650 per hour reasonable); *Safelite Grp., Inc. v. Rothman*, No. 15-cv-1878 (SRN/KMM), 2017 WL 3495768, at *7 (D. Minn. Aug. 11, 2017) (finding $370 and $560 per hour reasonable), a slight reduction is appropriate to account for Stewart's limited evidence to justify the partners' rates.  Therefore, Ms. Denny and Mr. Davis's rates will each be reduced by $50 to $445 per hour and $500 per hour. Based on my experience and familiarity with the market, I find that $250 for a second-year associate and $125 for a paralegal are reasonable hourly rates.

Stewart's counsel spent a total of 61.5 hours working on this case.  ECF No. 58-1 at 2–3.  The total hours break down as follows: Artur Davis, 23.5 hours; Emma Denny, 20 hours; Associate, 4.7 hours; Paralegal, 13.3 hours.  *Id.*  Having carefully reviewed the itemization of time spent, that amount of time was reasonable to file a complaint, respond to counterclaims, perform preliminary discovery, respond to Golden Victory's motion to stay the case, and move for default judgment.

The lodestar amount is therefore calculated as follows: $500 x 23.5, $445 x 20, $250 x 4.7, and $125 x 13.3, for a total award of $23,487.5.  Stewart has not requested any enhancement, and the lodestar amount will not be reduced *sua sponte*.

(5) Stewart's request for $5,902.65 in costs will be granted in part.  Although a prevailing § 3730(h) plaintiff is entitled to an award of "litigation costs," courts have concluded this is limited to ordinary costs as defined by 28 U.S.C. § 1920, the statute governing the taxation of costs.  *See Neal v. Honeywell, Inc.*, 191 F.3d 827, 834 (7th Cir. 1999); *Kakeh v. United Plan. Org.*, 657 F. Supp. 2d 15, 17–18 (D.D.C. 2009); *Thompson v. Quorum Health Res., LLC*, No. 1:06-CV-168, 2010 WL 2044542, at *4 (W.D. Ky. May

21, 2010).   This is consistent with the Eighth Circuit's holding that without explicit statutory authority for the taxation of expenses as costs, "federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920." *Johnson, Tr. of Operating Eng'rs Loc. #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 527 (8th Cir. 2020) (quoting *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987)).

Section 1920 itemizes several types of expenditures a judge or clerk of court may tax as costs.   Section 1920(1) provides that "[f]ees of the clerk and marshal" are recoverable, while § 1920(2) provides that "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case" are recoverable.   Stewart's filing fee and pro hac vice fee, totaling $502.00, will be awarded as taxable costs under § 1920(1).[9] *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 579 F.3d 894, 896 (8th Cir. 2009) ("*[P]ro hac vice* fees are costs under 28 U.S.C. § 1920.").   Stewart's costs for a transcript of the default-judgment hearing, in the amount of $244.40, will be awarded as taxable costs under § 1920(2) because that transcript was necessarily obtained for Stewart's supplemental brief.   *See Nat'l Presto Indus., Inc. v. U.S. Merchs. Fin. Grp., Inc.*, No. 18-cv-3321 (SRN/LIB), 2023 WL 7986605, at *17 (D. Minn. Nov. 17, 2023); ECF No. 55 (ordering supplemental briefing).   The remaining requested costs are not taxable costs that can be awarded under § 1920.

---

[9]     In support of his request for costs, Stewart filed a spreadsheet titled "HKM Employment Attorneys LLP Unbilled Charges."   ECF No. 58-1 at 5.   The requested costs are categorized based on the descriptions included in that spreadsheet.

However, expenses that are not taxable costs "may nevertheless be awarded if they are normally billed to clients." *Miller v. Bd. of Regents of Univ. of Minn.*, 402 F. Supp. 3d 568, 597 (D. Minn. 2019); *see also Charps*, 950 F.3d at 528 ("Some expenses that the district court awarded as 'costs' might be awarded as attorney's fees if they are separately billed under the prevailing practice in the local community."). Here, Stewart's requested travel, lodging, and related expenses will be awarded as attorneys' fees. *See Miller*, 402 F. Supp. 3d at 597 (granting a request for travel expenses as part of an attorneys' fee award); *Safelite*, 2017 WL 3495768, at *4 (same). These travel-related expenses total $1,409.68. $9.55 will be awarded for shipping. *See Safelite*, 2017 WL 3495768, at *4 (granting delivery charges). And another $369.22 will be awarded for third-party vendors proofreading and formatting filings. It seems clear that these expenses saved time and money that would otherwise have been spent on a lawyer or paralegal doing the same work at a higher rate.

Stewart also requests $142.80 for "[c]lient support services" and an $850.00 "Admin Fee." Without more details about these fees, it is impossible to determine whether they are normally billed to clients and were reasonable. Finally, Stewart requests $2,375.00 in expert fees for the report of Dr. Jones. ECF No. 58-1 at 5. But "expert witness fees are generally not part of attorney's fees." *Charps*, 950 F.3d at 528; *but see Miller*, 402 F. Supp. 3d at 597 (awarding expert fees as expenses that are normally billed to clients). And because expert witness fees are also not available under § 1920, the costs for Stewart's expert will not be awarded here.

To summarize, $746.40 of Stewart's requested costs will be awarded as taxable costs under § 1920, $1,788.45 of Stewart's requested costs will be awarded as attorneys' fees because they are expenses ordinarily billed to clients, and the remaining $3,367.80 requested as costs will be denied because Stewart has not demonstrated they fall into either permissible category of recovery.

(6) Stewart's request for $1,235,510.10 in liquidated damages will be granted in part. Stewart claims that "[a] prevailing plaintiff in an FCA case is entitled to liquidated damages in an amount equal to two times the award of back pay, interest on back pay, and compensation for any special damages . . . ." ECF No. 57 at 26. That's not quite right. Section 3730(h)(2) provides:

> Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h)(2). Any interpretation of § 3730(h)(2) must heed the commands of punctuation. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 403 (2021). Here, four items of relief are separated by a comma: reinstatement, backpay, interest on backpay, and compensation for special damages. The second item in that list is "2 times the amount of back pay." 31 U.S.C. § 3730(h)(2). Because this form of relief is separated by commas in a series, the doubling language only applies to backpay, not prejudgment interest or special damages. Other courts agree. *Neal*, 191 F.3d at 831–32 ("The False Claims Act provides for *both* double back pay *and* other relief in the form of 'special damages.'"); *Wilkins*, 198

26

F. Supp. 2d at 1088–92 (doubling only backpay); *Miniex v. Houston Hous. Auth.*, 400 F. Supp. 3d 620, 654–662 (S.D. Tex. 2019) (same); *Kakeh v. United Plan. Org.*, 655 F. Supp. 2d 107, 125 (D.D.C. 2009) (same).   Therefore, only Stewart's backpay award will be doubled; he will be awarded an additional $725,000.

(7) Stewart's request for $125,000 in severance pay will be denied.   As the Supreme Court has explained, it "goes without saying that the courts can and should preclude double recovery by an individual."   *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) (quoting *Gen. Tel. Co. of the Nw. v. E.E.O.C.*, 446 U.S. 318, 333 (1980)).   For this reason, "[f]airness requires that there be certain deductions and offsets in computing backpay rewards."   Paul H. Tobias, *Litigating Wrongful Discharge Claims* § 8:14 (June 2023 Update).   One such deduction is severance pay.   *Id.*; *Smith v. World Ins. Co.*, 38 F.3d 1456, 1466 (8th Cir. 1994) (affirming jury instruction "to reduce the backpay award by the amount of the severance package"); *Folz v. Marriott Corp.*, 594 F. Supp. 1007, 1017–18 (W.D. Mo. 1984) (subtracting severance pay from backpay award); *Stuart v. Normandy Osteopathic Med. Ctr. of St. Louis, Inc.*, No. 89-993C(1), 1990 WL 112432, at *2 (E.D. Mo. May 8, 1990) ("Plaintiff does not dispute that his severance pay, his wages from DePaul Hospital, and his Subway restaurant salary are deductible from any potential back pay award.").   Because severance pay is normally taken out of a backpay award, granting both after the fact would amount to double recovery.   And because backpay is doubled after reductions, *Hammond*, 218 F.3d at 891–92, awarding backpay (instead of severance) will result in a greater total damages award.

IV

There is one final wrinkle—an entry of default judgment would not dismiss Golden Victory's counterclaims.  *See, e.g.*, *Park Hosp. LLC v. Sangha Hosp., LLC*, No. 18-cv-2171, (NEB/ECW), 2020 WL 4937583, at *1 (D. Minn. Aug. 24, 2020) (separately granting default judgment and dismissing counterclaims).  And Stewart does not request dismissal of Golden Victory's counterclaims.  *See* ECF No. 61 (proposed order).  Nonetheless, Rule 41(b) allows a court to dismiss a case *sua sponte* for failure to prosecute.  *Sterling v. United States*, 985 F.2d 411, 412 (8th Cir. 1993).  As Rule 41(b) states, "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it."  Fed. R. Civ. P. 41(b).  "[D]ismissal with prejudice is an extreme sanction and should be used only in cases of willful disobedience of a court order or continued or persistent failure to prosecute a complaint."  *Smith v. Gold Dust Casino*, 526 F.3d 402, 405 (8th Cir. 2008) (quoting *Givens v. A.H. Robins Co.,* 751 F.2d 261, 263 (8th Cir. 1984)).  Golden Victory was ordered to find new counsel in September 2023.  ECF No. 40.[10]  It has not done so.  Nor have the owners communicated with the Court *pro se* to explain their failure to retain new counsel.  And Golden Victory's owners did not respond to Stewart's motion for default judgment, which Stewart served in December 2023.  *See* ECF No. 50.  Golden Victory's persistent failure to prosecute its counterclaims merits with-prejudice dismissal.

---

[10]   The last time Golden Victory's owners communicated with its counsel was March 2023.  ECF No. 33 ¶¶ 5–10.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Plaintiff and Counter-Defendant Bryan Stewart's Motion for Default Judgment [ECF No. 45] is **GRANTED IN PART** and **DENIED IN PART**.

2.     Judgment is awarded to Stewart and against Defendant Golden Victory Medical LLC in the total amount of **$1,821,620.68**, to bear interest at the statutory rate from the date of judgment.  The award consists of:

      a.     **$1,500,000** in backpay;[11]

      b.     **$45,598.33** in prejudgment interest;

      c.     **$250,000** for emotional distress;

      d.     **$25,275.95** in attorneys' fees; [12] and

      e.     **$746.40** in taxable costs.

3.     Defendant Golden Victory Medical LLC's Counterclaims are **DISMISSED WITH PREJUDICE** for failure to prosecute.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Date: March 26, 2024          s/ Eric C. Tostrud
                                   Eric C. Tostrud
                                   United States District Court

---

[11]     $725,000 x 2.

[12]     $23,487.5 + $1,788.45.